**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | | |
|---|---|---|
| AARON R. ROUSE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 2:26-cv-00236-JKW-DEM |
| v. | ) | |
| | ) | |
| THE NFL PLAYER DISABILITY | ) | |
| AND SURVIVOR BENEFIT PLAN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

# TABLE OF CONTENTS

INTRODUCTION ..... 1

STATEMENT OF MATERIAL FACTS ..... 5

A. The Plan and the Disability Board ..... 5

B. Pertinent Plan Provisions Governing T&P Benefits ..... 6

C. Rouse's T&P Application and the Materials Submitted in Support ..... 7

D. The Committee Referred Rouse to Four Neutral Physicians, and None Found Him Totally and Permanently Disabled ..... 8

E. The Committee's Initial Adverse Benefit Determination ..... 11

F. Rouse Appealed, and Four New Neutral Physicians Opined That He Was Not Totally and Permanently Disabled ..... 12

G. The Plan Provided Rouse With Opportunity to Respond to Neutral Physicians' Reports and Rouse Submitted Additional Medical Records ..... 15

H. The Board's Final Determination ..... 17

STANDARD OF REVIEW ..... 18

ARGUMENT ..... 19

I. The Board Did Not Abuse Its Discretion in Determining That Rouse Failed to Satisfy Section 3.1(d)'s Threshold Requirement. ..... 19

A. The Board applied the Plan's terms as written. ..... 19

B. The Board's decision served the Plan's purposes and goals. ..... 21

C. The Board relied on the concurring opinions of eight specialist Neutral Physicians and objective testing. ..... 22

D. The remaining *Booth* factors confirm that the Board's decision was reasonable. ..... 25

II. The Board Provided Rouse a Full and Fair Review ..... 27

III. Any Relief Should Be Limited to Remand. ..... 29

CONCLUSION ..... 29

## TABLE OF AUTHORITIES

**Cases**

*Balkin v. Unum Life Ins. Co.*
No. GLS 21-1623, 2024 WL 1346789 (D. Md. Mar. 29, 2024)............................................22

*Berry v. Ciba-Geigy Corp.*
761 F.2d 1003 (4th Cir. 1985) ............................................................................................29

*Black & Decker Disability Plan v. Nord*
538 U.S. 822 (2003)..............................................................................................................23

*Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan*
201 F.3d 335 (4th Cir. 2000) ........................................................................................ *passim*

*Boyd v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*
796 F. Supp. 2d 682 (D. Md. 2011)......................................................................................27

*Carden v. Aetna Life Ins. Co.*
559 F.3d 256 (4th Cir. 2009) ................................................................................................19

*Champion v. Black & Decker (U.S.) Inc.*
550 F.3d 353 (4th Cir. 2008) ................................................................................................20

*Collins v. Aetna Life Ins. Co. of Am.*
700 F. App'x 205 (4th Cir. 2017)..........................................................................................19

*Colucci v. Agfa Corp. Severance Pay Plan*
431 F.3d 170 (4th Cir. 2005) ..........................................................................................19, 20

*Conkright v. Frommert*
559 U.S. 506 (2010)..............................................................................................................29

*Courson v. Bert Bell NFL Player Ret. Plan*
75 F. Supp. 2d 424 (W.D. Pa. 1999), *aff'd*, 214 F.3d 136 (3d Cir. 2000)...............................27

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*
487 F. Supp. 3d 807 (N.D. Cal. 2020), *aff'd and remanded on other grounds*, 855 F. App'x 332 (9th Cir. 2021)..........................................................................................................27

*Elliott v. Sara Lee Corp.*
190 F.3d 601 (4th Cir. 1999) ..............................................................................................4, 23

*Evans v. Eaton Corp. Long Term Disability Plan*
514 F.3d 315 (4th Cir. 2008) ................................................................................................21

*Firestone Tire & Rubber Co. v. Bruch*
489 U.S. 101 (1989)..............................................................................................................18

*Friz v. J&H Marsh & McLennan, Inc.*
2 F. App'x 277 (4th Cir. 2001)..............................................................................................21

*Fuller v. Sun Life Assurance Co. of Canada*
No. 1:23cv1241 (DJN), 2024 WL 4120787 (E.D. Va. Sept. 6, 2024)......................................1

*Geiger v. Zurich Am. Ins. Co.*
72 F.4th 32 (4th Cir. 2023) ....................18, 23

*Goldfarb v. Mayor & City Council of Baltimore*
791 F.3d 500 (4th Cir. 2015) ....................3

*Grabowski v. Hartford Life & Accident Ins. Co.*
747 F. App'x 923 (4th Cir. 2018)....................18, 19, 23

*Hailey v. Verizon Commc'ns Long Term Disability Plan*
No. 1:13-CV-001528-GBL, 2014 WL 5421242 (E.D. Va. Oct. 22, 2014) ....................19

*Hayes v. Prudential Ins. Co. of Am.*
60 F.4th 848 (4th Cir. 2023) ....................18

*Johnson v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*
468 F.3d 1082 (8th Cir. 2006) ....................27

*LeFebre v. Westinghouse Elec. Corp.*
747 F.2d 197 (4th Cir. 1984) ....................19

*Metro. Life Ins. Co. v. Glenn*
554 U.S. 105 (2008)....................26, 27

*Morris v. Nat'l Football League Ret. Bd.*
833 F. Supp. 2d 1374 (S.D. Fla. 2011), *aff'd*, 482 F. App'x 440 (11th Cir. 2012) ....................27

*Smith v. Cont'l Cas. Co.*
369 F.3d 412 (4th Cir. 2004) ....................18

*Smith v. NFL Player Disability & Neurocognitive Benefit Plan*
No. 1-22-CV-00928-RP, 2024 WL 722594 (W.D. Tex. Jan. 9, 2024), *report and recommendation adopted*, No. 1:22-CV-928-RP, 2024 WL 1123588 (W.D. Tex. Mar. 13, 2024) ....................20, 21, 24, 25

*Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*
No. JFM-10-3203, 2011 WL 10005532 (D. Md. Jan. 13, 2011)....................27

*Switzer v. Benefits Admin. Comm.*
2014 WL 4052855 (D. Md. Aug. 13, 2014) ....................28

*Tekmen v. Reliance Standard Life Ins. Co.*
55 F.4th 951 (4th Cir. 2022) ....................1

*Tobey v. Keiter, Stephens, Hurst, Gary & Shreaves*
No. 3:13-CV-315, 2014 WL 61325 (E.D. Va. Jan. 7, 2014) ....................1

*US Airways, Inc. v. McCutchen*
569 U.S. 88 (2013)....................19

*Williams v. Metro. Life Ins. Co.*
609 F.3d 622 (4th Cir. 2010) ....................18

*Wilson v. UnitedHealthcare Ins. Co.*
27 F.4th 228 (4th Cir. 2022) ....................26

*Youboty v. NFL Player Disability & Neurocognitive Benefit Plan*
856 F. App'x 497 (5th Cir. 2021) .......... 20

**Statutes**

ERISA § 3(37), 29 U.S.C. § 1002(37) .......... 5

ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2) .......... 5

ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) .......... 4, 19

ERISA § 503, 29 U.S.C. § 1133 .......... 26, 27

**Regulations**

29 C.F.R. § 2560.503-1 .......... 27, 28

**Rules**

Fed. R. Civ. P. 52 .......... 1

Fed. R. Civ. P. 56 .......... 1

Fed. R. Evid. 201 .......... 3

Defendant The NFL Player Disability and Survivor Benefit Plan (the "Plan" or "Defendant"), pursuant to the Court's Scheduling Order directing the parties to file "dispositive motions based upon the administrative record," ECF No. 31 at ¶ 4, respectfully submits this memorandum in support of its motion for judgment on the administrative record under Federal Rule of Civil Procedure 52.[1]

## INTRODUCTION

Plaintiff Aaron Rouse ("Rouse" or "Plaintiff"), a former NFL Player, asked the Plan to find that he could not work while he was working. He was elected to the Virginia Beach City Council in 2018 and took office on January 1, 2019. (ROUSE 000099, 000297).[2] As Rouse himself

---

[1] In *Tekmen v. Reliance Standard Life Insurance Co.*, 55 F.4th 951, 959-61 (4th Cir. 2022), the Fourth Circuit held that a bench trial on the papers under Rule 52, rather than summary judgment, is the proper vehicle for resolving an ERISA denial of benefits action confined to the administrative record, reflecting the court's longstanding "reservations" about the fit of the summary judgment standard in the ERISA context. *See also Fuller v. Sun Life Assurance Co. of Canada*, No. 1:23cv1241 (DJN), 2024 WL 4120787, at *4 (E.D. Va. Sept. 6, 2024) (because "disputed issues of fact often surround the ultimate conclusion to award or deny benefits," "[s]uch disputes cannot be resolved properly within the confines of Rule 56" and "[i]nstead, a court may conduct a Rule 52 bench trial ... limited to the administrative record that was before the plan administrator") (citing *Tekmen*, 55 F.4th at 960-61) (internal quotation marks omitted). While *Tekmen* reserved the question whether Rule 52 also governs where review is for abuse of discretion, as it is here, *Tekmen*, 55 F.4th at 961, n.5, the Court need not resolve that question. Where the plan administrator's determination is entitled to deference and review is confined to the administrative record, "whether the Court proceeds under Federal Rule of Civil Procedure 56 or Rule 52, the result is the same": "judgment turns on a determination of whether the plan administrator abused its discretion." *Tobey v. Keiter, Stephens, Hurst, Gary & Shreaves*, No. 3:13-CV-315, 2014 WL 61325, at *3 & n.2 (E.D. Va. Jan. 7, 2014) ("[I]n actions brought under ERISA, summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment ... do not apply") (internal citation and quotation marks omitted). Accordingly, should the Court conclude that Rule 52 is not the appropriate vehicle, Defendant respectfully requests that the Court construe this motion as one for summary judgment under Rule 56. For the reasons discussed below, Defendant is entitled to judgment under either Rule.

[2] Parenthetical "ROUSE" citations refer to the Bates-stamped pages in the administrative record. Capitalized terms not otherwise defined in this memorandum (e.g., "Player") have the meanings assigned to them in the Plan. Pursuant to the Court's Sealing Order, ECF No. 32, the Plan has filed portions of the administrative record publicly and the remainder under seal. *See* ECF No. 37.

disclosed during the administrative proceedings on his claim, he remained a sitting Councilman throughout the administrative proceedings and continued performing the duties of that office, including attending Council meetings, meeting with constituents, taking calls from constituents, and engaging with community leaders. (ROUSE 000297).

The relief Rouse sought from the Plan, and now seeks from this Court, is a determination that he is entitled to total and permanent disability ("T&P") benefits, the highest level of disability benefit available under the Plan. To qualify, a Player must be "totally disabled to the extent that he is substantially unable to engage in any occupation or employment for remuneration or profit," and that condition must be "permanent." Plan § 3.1(d) (ROUSE 000011).

To evaluate Rouse's claim for T&P benefits, the Plan referred him to eight medical specialists ("Neutral Physicians," as more fully defined below) across four relevant medical disciplines—neuropsychology, neurology, orthopedics, and psychiatry. Each was jointly selected by the NFL Players Association (the "NFLPA") and the NFL Management Council (the "Management Council"), each was paid a flat fee that did not depend on the outcome of the examination, and each was obligated to provide an opinion without bias for or against Mr. Rouse. Plan § 12.3(a) (ROUSE 000062). Not one concluded that Rouse was totally and permanently

---

The seal does not extend to the parties' briefing, and this memorandum is accordingly filed publicly and without redaction. Plaintiff has represented that he "does not seek to seal any briefs, motions, orders, or other litigation filings submitted to this Court," and has not requested from the Court that any portion of any litigation filings be filed in redacted form. ECF No. 18, p. 8; ECF No. 29, p. 3. The Sealing Order likewise provides that it "speaks only to the documents specifically identified in the Plaintiffs' motion," "may not be cited to or relied on by the parties to seal or otherwise restrict access to documents already in the public record," and "makes no finding with respect to the propriety of sealing these or similar documents in connection with specific future proceedings, including the propriety of sealing documents introduced as evidence, or information relied upon by the court in awarding relief sought by motion to which briefs or exhibits may be directed." ECF No. 32, pp. 2-3.

disabled within the meaning of the Plan. (ROUSE 000209, 000231, 000240, 000246, 000280, 000306, 000314, 000319-20, 000519-20).

The Plan makes that fact dispositive. Under Section 3.1(d), a Player is eligible for T&P benefits only if at least one Neutral Physician finds him totally and permanently disabled; absent that medical finding, he is ineligible regardless of any other evidence in the administrative record. Plan § 3.1(d) (ROUSE 000011). The Plan's Disability Board (the "Board")—the Plan's named fiduciary, which decides benefit appeals—reviewed the entire record, including the materials Rouse submitted on appeal, and unanimously determined that Rouse did not satisfy Section 3.1(d) because no Neutral Physician had rendered the required medical finding of total and permanent disability. (ROUSE 000519-21).

Since the Board's decision, Rouse's political career has continued to rise. Shortly after the Board issued its final decision denying his claim for T&P benefits, Rouse was elected to the Senate of Virginia in a January 2023 election. *See* Virginia Senate, Member Page for Senator Aaron R. Rouse, available at https://apps.senate.virginia.gov/Senator/memberpage.php?id=S113. He remains a member of the Virginia Senate today. *Id.* In June 2025, he competed in the Democratic primary for Lieutenant Governor of Virginia, the second highest office in the Commonwealth. *See* Virginia Department of Elections, June 2025 Democratic Primary Results, available at https://enr.elections.virginia.gov/results/public/virginia/elections/2025-June-Democratic-Primary.[3]

[3] The Court may take judicial notice of these facts as they are matters of public record that are not subject to reasonable dispute. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508-09 (4th Cir. 2015); Fed. R. Evid. 201(b), (d) (at "any stage of the proceeding," a "court may judicially notice a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

Rouse's First Amended Complaint asserts a single claim for T&P benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). FAC, ECF No. 10, ¶¶ 10, 53-54. Rouse bears the burden of proving that he satisfies all of the Plan's T&P eligibility requirements set forth in Section 3.1 (ROUSE 000011). *See Elliott v. Sara Lee Corp.*, 190 F.3d 601, 603 (4th Cir. 1999) ("The burden of proving the disability is on the employee."). The Board determined that he failed to carry that burden. Whether that determination was a reasonable exercise of the Board's discretion is the question before this Court.

The Board's determination is reviewed only for abuse of discretion because, as Rouse acknowledges in the First Amended Complaint, the Plan grants the Board "full and absolute discretion" to interpret the Plan and decide claims for benefits. Plan §§ 9.2, 9.9 (ROUSE 000053-54, 000057); FAC ¶ 28. The reasonableness of the Board's decision is measured in this Circuit against the eight factors identified in *Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000), and each supports the Board's determination here: the Board applied the Plan's terms as written; the Board's decision served the Plan's purposes and goals by enforcing the T&P eligibility standard that the NFLPA and the Management Council bargained for; the Board relied on the concurring opinions of eight specialist Neutral Physicians and objective testing; the Board interpreted the Plan consistently with its other provisions and with earlier interpretations; the Board made its decision through a reasoned and principled process; the Board's decision complied with ERISA's procedural and substantive requirements; the Board applied the Plan's own criteria rather than any external standard; and the Board's motives were proper and it operated free from any structural conflict of interest.

Rouse now asks the Court to determine that, despite holding elected office and performing the duties of that office throughout the period of his claimed disability, he was nonetheless totally

and permanently disabled, meaning "substantially unable to engage in any occupation or employment for remuneration or profit." Plan § 3.1(d) (ROUSE 000011). Nothing in the administrative record supports that conclusion. In any event, under the highly deferential standard of review that governs this case, the question is not whether the Court would reach the same conclusion in the first instance, but whether the Board acted reasonably in applying the Plan's terms to the record before it. As demonstrated below, the answer is yes. The Court should therefore uphold the Board's decision and enter judgment for Defendant, dismissing the First Amended Complaint in its entirety and with prejudice.

## STATEMENT OF MATERIAL FACTS

### A. The Plan and the Disability Board

The Plan is a multiemployer welfare benefit plan as defined in ERISA § 3(37), 29 U.S.C. § 1002(37). It is established and maintained through collective bargaining between the NFLPA, which represents professional football Players, and the Management Council, which represents the member clubs of the National Football League (the "League"). FAC ¶¶ 12-14.

The Board is the Plan's named fiduciary within the meaning of ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2), and is responsible for implementing and administering the Plan. Plan § 9.2 (ROUSE 000053-54); FAC ¶¶ 15-17. Claims for disability benefits are decided in the first instance by the Disability Initial Claims Committee (the "Committee"), and the Board decides appeals. Plan §§ 9.2(c), 9.5 (ROUSE 000054, 000056); FAC ¶¶ 22-24.

The Board has "full and absolute discretion, authority, and power to interpret, control, implement, and manage the Plan," including the power to "[d]efine the terms of the Plan," "construe the Plan," and "reconcile any inconsistencies therein," and the power to decide claims for benefits. Plan §§ 9.2, 9.2(a), (c) (ROUSE 000053-54); FAC ¶ 28. The Committee likewise

has "full and absolute discretion, authority, and power to interpret the Plan" when making its decisions. Plan § 9.5 (ROUSE 000056). Section 9.9 provides that benefits "will be paid only if" the Committee or the Board "decides in its discretion that the applicant is entitled to them"; that they "will have the broadest discretion permissible under ERISA and any other applicable laws"; and that they "will consider all information in the Player's administrative record, and shall have full and absolute discretion to determine the relative weight to give such information." Plan § 9.9 (ROUSE 000057); FAC ¶ 28. On appeal, the Board reviews the claim without deference to the Committee, considering all available information. Plan § 13.14(a) (ROUSE 000067); FAC ¶¶ 25-26.

**B. Pertinent Plan Provisions Governing T&P Benefits**

Section 3.1 establishes the "General Standard for Eligibility," under which a Player will receive T&P benefits "if and only if" each of the conditions in subsections (a) through (f) is met. Plan § 3.1 (ROUSE 000011-12).

As relevant here, Section 3.1(d) establishes a threshold eligibility requirement that turns on the Neutral Physician medical findings:

> At least one Plan Neutral Physician must find, under the standard of Section 3.1(e), that (1) the Player has become totally disabled to the extent that he is substantially unable to engage in any occupation or employment for remuneration or profit, excluding any disability suffered while in the military service of any country, and (2) such condition is permanent. If no Plan Neutral Physician renders such a conclusion, then this threshold requirement is not satisfied, and the Player will not be eligible for and will not receive Plan T&P benefits, regardless of any other fact(s), statement(s), or determination(s), by any other person or entity, contained in the administrative record.
>
> Plan § 3.1(d) (ROUSE 000011); FAC ¶ 37.

A Neutral Physician is a health care professional jointly designated by the NFLPA and the Management Council to examine Players who apply for benefits. Plan §§ 1.25, 12.3(a) (ROUSE 000009, 000062). A Neutral Physician must certify that any opinions he or she offers will be

provided "without bias for or against any Player," and must "accept and provide services pursuant to a 'flat-fee' agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her opinions tend to support or refute any given Player's application for benefits." Plan § 12.3(a) (ROUSE 000062). The Neutral Physicians examine each referred Player and "provide such report or reports on the Player's condition as necessary for the [Board] or the [Committee] to make an adequate determination as to that Player's physical or mental condition." Plan § 12.3(b) (ROUSE 000062).

Section 3.1(e) provides that, after reviewing the Neutral Physician reports, "along with all other facts and circumstances in the administrative record," the Committee or the Board "must conclude, in its absolute discretion," that the Player is totally and permanently disabled under the standard described above. Plan § 3.1(e) (ROUSE 000011). A disability is deemed "permanent" for purposes of Section 3.1 "if it has persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period." Plan § 3.1(e)(3) (ROUSE 000012).

**C. Rouse's T&P Application and the Materials Submitted in Support**

The Plan received Rouse's T&P application on March 30, 2021. (ROUSE 000097-104, 000265); FAC ¶ 33. Rouse stated that he was "unsure" if he was eligible for T&P benefits. (ROUSE 000098). He represented to the Plan that he was "unable to maintain focus and concentration due to [his] multiple physical conditions," that he took "rest periods during the day," could not "sit or stand for long periods of time," had to "lie during the day and take unscheduled breaks," "often cancel[ed] appointments if [he was] in pain," and could not "perform household activities such as yard work and physical activities." (ROUSE 000098). He further asserted that he had been "unable to sustain gainful employment in more than ten years." (*Id.*).

In the employment section of the same application, Rouse listed his employer as the City of Virginia Beach, his occupation as "Elected Official–City Councilman," his employment start date as January 1, 2019, and his salary before taxes as $28,000. (ROUSE 000099). The tax records submitted with the application reflected City Council wages of $25,461 in 2019 and $26,076 in 2020. (ROUSE 000105, 000111).

In support of his application, Rouse submitted medical records from orthopedist Dr. Arthur Wardell dated January 24, 2014 to May 9, 2014; Glasson Sports Medicine physical therapy rehabilitation notes and records dated July 23, 2015 to December 6, 2017; and Sentara Healthcare patient notes and records, diagnostic imaging studies, operative reports, and laboratory results dated August 1, 2017 to January 30, 2018. (ROUSE 000116-97, 000199). None of these records stated that Rouse was totally and permanently disabled or unable to engage in any occupation for remuneration or profit, nor did they reference or apply the Plan's eligibility standard for T&P benefits. (*Id.*).

**D. The Committee Referred Rouse to Four Neutral Physicians, and None Found Him Totally and Permanently Disabled**

The Committee referred Rouse for examinations by four Neutral Physicians in the specialties encompassing his claimed impairments: a neuropsychologist, a neurologist, an orthopedist, and a psychiatrist. (ROUSE 000265); FAC ¶ 36.

**(1) Dr. Bang's Neuropsychological Examination**

Dr. Charlene Bang, a neuropsychologist, evaluated Rouse on June 11, 2021 and reviewed his T&P application and the medical records submitted in support of it. (ROUSE 000202-14). Dr. Bang administered a comprehensive neuropsychological battery measuring Rouse's intellectual functioning, processing speed and efficiency, attention and working memory, verbal and visual

memory and learning, executive functioning, language functioning, visual spatial and perceptual skills, motor speed, and mood and personality. (ROUSE 000204, 000207-08).

The results, which Dr. Bang deemed valid and interpretable, placed Rouse's intellectual function in the Average range, consistent with his estimated premorbid ability. (ROUSE 000207). His performance was Average or better across most domains: processing speed was Average to High Average, with Coding at the 84th percentile and motor speed Above Average; immediate recall visual memory was Superior, at the 95th percentile; verbal learning showed an Above Average learning slope; and phonemic fluency was High Average, at the 91st percentile. (ROUSE 000207-09, 000211-13). Dr. Bang summarized Rouse's performance as "relatively within expected limits in all cognitive domains assessed." (ROUSE 000209). The Minnesota Multiphasic Personality Inventory-2-Restructured Form ("MMPI-2-RF") completed by Rouse raised a concern about "the possible impact" of his "over-reporting" of "somatic and cognitive complaints," and Dr. Bang interpreted it "with caution." (ROUSE 000208). Dr. Bang concluded that Rouse's cognitive profile did not meet the Plan's standard for T&P disability. (ROUSE 000209).

**(2) Dr. Azhar's Neurological Examination**

Dr. Salman Azhar, a neurologist, examined Rouse on June 10, 2021 and reviewed the medical records submitted in support of Rouse's T&P application. (ROUSE 000215-32). Dr. Azhar administered the Montreal Cognitive Assessment ("MoCA"), a 30-point cognitive screening test on which scores of 26 and above are generally considered normal. (ROUSE 000232). Rouse scored 28 out of 30, which Dr. Azhar characterized as within the normal range. (ROUSE 000225, 000230, 000232). The neurological examination was largely normal and Romberg testing did not identify any balance issues. (ROUSE 000225-30). The reviewed brain

MRI, head CT, and cerebrospinal-fluid studies identified no abnormalities. (ROUSE 000218, 000230-31).

Dr. Azhar found Rouse's self-reported pattern of memory loss "unusual," noting that Rouse claimed to remember "remote events and also recent events up to 24 hours ago" but not the intervening period, even though he described in detail some of the City Council decisions made during the pandemic. (ROUSE 000230). Dr. Azhar noted that Rouse had "done well at work" and appeared to "function at a high level as per his own assessment." (*Id.*). As to Rouse's lower back pain complaints, Dr. Azhar found no current limitation, documenting that Rouse was "able to ambulate well with full strength and mobility." (ROUSE 000225, 000231). On the Physician Report Form, Dr. Azhar answered "No" to whether Rouse was T&P disabled and wrote that he could work with "No restrictions." (ROUSE 000216).

**(3) Dr. Sherman's Orthopedic Examination**

Dr. Orrin Sherman, an orthopedist, examined Rouse on June 9, 2021 and reviewed the medical records submitted in support of Rouse's T&P application. (ROUSE 000233-41). Although Dr. Sherman documented some abnormal findings, including reduced lumbar spine and shoulder motion, he also documented Rouse's "normal gait," the absence of motor or sensory deficits of the upper and lower extremities, and his retained ability to write and use a computer mouse. (ROUSE 000240). Dr. Sherman noted that Rouse was "working successfully as a Councilman for the City of Virginia Beach," and that, according to Rouse, his only work-related issue was "standing for an extended period of time." (*Id.*). Dr. Sherman concluded that Rouse's orthopedic conditions did not prevent him from working and were not significant enough to warrant T&P benefits. (ROUSE 000234, 000240).

**(4) Dr. Norman's Psychiatric Examination**

Dr. Matthew Norman, a psychiatrist, conducted Rouse's psychiatric examination on October 1, 2021. (ROUSE 000247). He also reviewed Rouse's T&P application and the medical records submitted in support of it, administered a MoCA, and asked Rouse to complete Patient Health Questionnaire-9 ("PHQ-9") and Generalized Anxiety Disorder-7 ("GAD-7") self-report questionnaires. (*Id.*). Rouse scored 28 out of 30 on the MoCA, which Dr. Norman found "not suggestive of any cognitive impairment." (ROUSE 000249-50). Although Rouse's self-reported PHQ-9 and GAD-7 scores fell in the moderately severe depression and moderate anxiety ranges, Dr. Norman found the clinical examination inconsistent with those self-ratings. (ROUSE 000250). The mental status examination was largely normal, with "logical and goal-directed" thoughts, "good judgment," and estimated above-average intelligence. (*Id.*). Rouse reported that he engaged in "numerous activities" on a "regular basis," including "exercising, mowing his own grass, [and] political duties." (ROUSE 000248). The medical records Dr. Norman reviewed contained no notation of any psychiatric diagnosis, treatment, or impairment, consistent with Rouse's report that he had never been evaluated or treated by a mental health provider and had never taken psychiatric medication. (ROUSE 000248-49). Dr. Norman rendered no psychiatric diagnosis, answered "No" to whether Rouse was T&P disabled, and stated that Rouse could "engage in any occupation without psychiatric restrictions or limitations." (ROUSE 000246, 000250).

**E. The Committee's Initial Adverse Benefit Determination**

On October 13, 2021, the Committee reviewed Rouse's T&P application, the medical records submitted in support of the application, and the four Neutral Physician reports. The Committee denied the claim because no Neutral Physician found Rouse totally and permanently disabled and he therefore did not satisfy Section 3.1(d). (ROUSE 000265-66); FAC ¶¶ 36-37. The

Committee noted that the records Rouse submitted did not support a finding of T&P disability. (ROUSE 000266). The Committee's October 21, 2021 letter communicated the reasons for the denial and advised Rouse of his appeal rights under the Plan. (ROUSE 000265-66).

**F. Rouse Appealed, and Four New Neutral Physicians Opined That He Was Not Totally and Permanently Disabled**

Through his counsel, Rouse appealed the initial denial by letter dated November 18, 2021. (ROUSE 000385); FAC ¶ 38. The Plan referred Rouse to four new Neutral Physicians—again a neuropsychologist, a neurologist, an orthopedist, and a psychiatrist. (ROUSE 000519); FAC ¶ 39.

**(1) Dr. Heilbronner's Neuropsychological Examination**

Dr. Robert Heilbronner, a neuropsychologist, conducted an independent neuropsychological evaluation of Rouse on September 22, 2022, and reviewed Rouse's T&P application and medical records submitted in support, the appeal letter, and Dr. Bang's and Dr. Azhar's Neutral reports. (ROUSE 000310-11). During the evaluation, Rouse reported that he was not taking any prescription medication and that he "prefer[red] not to take medicines for pain, depression, etc." (ROUSE 000312). Dr. Heilbronner observed that Rouse "did not exhibit any disturbances in gait or marked fine or gross motor abnormalities," that "[h]is recall of recent and remote information was intact," and that his "[t]hought processes were logical and goal-directed." (*Id*.). Dr. Heilbronner administered a comprehensive neuropsychological battery and found the test results valid and reliable. (ROUSE 000310-18). He reported that Rouse "scored within normal limits for someone his age and educational background on all of the tests, including those measuring intellectual abilities, attention and working memory, processing speed, learning and memory, visuoperceptual skills, language and executive functioning (inhibition, problem solving, etc.)." (ROUSE 000313). Dr. Heilbronner found that Rouse's test scores were "essentially at estimated premorbid levels and [did] not reflect a decline," and were "also highly similar to the

results from the previous evaluation in 2021, with some relative improvements in certain areas." (ROUSE 000314). Dr. Heilbronner opined that "[a]ny cognitive difficulties [Rouse] may currently be experiencing are likely associated with chronic headache pain and poor sleep," both of which he characterized as "treatable conditions." (*Id.*). He further documented that Rouse reported being able to perform the duties of a City Council member and participate meaningfully in his foundation. (*Id.*). Dr. Heilbronner ultimately concluded that, "from an objective cognitive perspective and in terms of Total and Permanent Disability Benefits, [Rouse] does not appear to have deficits that rise to the level whereby he is substantially unable to engage in any occupation for remuneration or profit." (*Id.*).

**(2) Dr. Aggarwal's Neurological Examination**

Dr. Sandeep Aggarwal, a neurologist, examined Rouse on September 24, 2022. (ROUSE 000275-92). Prior to the examination, Dr. Aggarwal reviewed Rouse's T&P Application, the medical records submitted in support of the application, and Rouse's appeal letter. (ROUSE 000278). In doing so, he noted that a 2017 MRI of the brain was normal, a 2014 CT scan of the brain was normal, and a 2014 spinal tap was normal. (*Id.*). During his examination, Dr. Aggarwal administered a MoCA, on which Rouse scored 28/30. (ROUSE 000288). Dr. Aggarwal observed that, despite reporting chronic daily migraines and "multiple sports related joint pain with associated sensorimotor loss," Rouse had not sought neurological or orthopedic treatment for those conditions. (ROUSE 000280). He further noted that Rouse's reported cognitive impairment occurred only during migraine flares and that the normal, unchanged findings from the 2021 and 2022 Neutral neuropsychological evaluations supported a pain-related rather than independently disabling cause of any cognitive complaints. (*Id.*). Based on his review and examination, Dr.

Aggarwal concluded: "Given this information and lack of treatment, [Rouse] would not fulfill criteria for total and permanent disability from a neurologic standpoint." (*Id.*).

**(3) Dr. Wolin's Orthopedic Examination**

Dr. Preston Wolin, an orthopedist, examined Rouse on September 20, 2022 and reviewed more than one hundred pages of records, including the prior orthopedic report, operative records, MRI studies, x-rays, and Glasson Sports Medicine physical therapy records from October 26, 2015 through December 6, 2017. (ROUSE 000319-27). His examination documented full cervical and lumbar range of motion; no evidence of nerve compression in the neck; no neurological injury or abnormality affecting the upper or lower extremities; and no fluid buildup or instability in either knee. (ROUSE 000323). Cervical, lumbar, and knee x-rays obtained during the examination showed no fracture or dislocation, and also showed preserved disc and joint spaces. (ROUSE 000324). Dr. Wolin found Rouse capable of employment subject to restrictions on bending, squatting, kneeling, frequent use of stairs, prolonged walking, standing more than one hour, and climbing, and he answered "No" to whether Rouse was totally and permanently disabled. (ROUSE 000319).

**(4) Dr. Chapman's Psychiatric Examination**

Dr. Mark Chapman, a psychiatrist, evaluated Rouse on September 23, 2022, and reviewed the medical records in the file, including Dr. Norman's prior Neutral report. (ROUSE 000293-307). Rouse reported that he had served as an elected member of the Virginia Beach City Council since 2018, described the experience as "great," and explained that his Council responsibilities included attending meetings, meeting with constituents, taking constituent calls, and engaging with community leaders. (ROUSE 000297). When asked whether he had difficulty carrying out his responsibilities as a Councilman, Rouse responded: "As long as my body is able to go, I'm good."

(*Id*.). Rouse further reported that he enjoyed fishing and contributed to household tasks and chores. (*Id*.). Regarding his cognitive functioning, Rouse reported that he did not typically forget important tasks, and was able to focus adequately on documentaries concerning subjects such as "military history" and "quantum theory." (ROUSE 000298). He also reported that he had "never undergone an evaluation for treatment with a mental health provider in his lifetime." (ROUSE 000299).

Rouse scored 28 out of 30 on the MoCA administered by Dr. Chapman, which Dr. Chapman found to be within the normal range. (ROUSE 000306, 000307). Dr. Chapman observed that Rouse "displayed no physical signs of an anxiety disorder on exam" and "mostly appeared euthymic, conversational and at ease." (ROUSE 000306). Based on his evaluation, Dr. Chapman concluded: "I cannot opine to a reasonable degree of medical certainty that Mr. Rouse suffers from an anxiety disorder, such as generalized anxiety disorder." (*Id.*). He further concluded that Rouse's "anxiety-like experiences do not impair him to the degree that he is unable to work." (*Id.*). Dr. Chapman likewise found no evidence of a mood disorder, noting that Rouse reported he had "never had a sustained period of feeling down and depressed for more than one or two days," except following the death of his grandparents. (ROUSE 000298). Describing Rouse as possessing "a high degree of psychological resilience," Dr. Chapman ultimately concluded: "Mr. Rouse is not totally and permanently disabled to the extent that he is substantially unable to engage in any occupation for remuneration or profit, and he is not restricted in the type of employment in which he can engage." (ROUSE 000306).

### G. The Plan Provided Rouse With Opportunity to Respond to Neutral Physicians' Reports and Rouse Submitted Additional Medical Records

On October 4, 2022, the Plan provided Rouse and his counsel with a copy of the Neutral Physicians' reports and advised him of his right to respond before the Board issued a final decision

on his appeal. (ROUSE 000484-85); FAC ¶ 40. In response, Rouse submitted through counsel medical records from Wagner Retina Center, Kirven Orthopedic Group, and Hampton Roads Neuropsychology. (ROUSE 000401, 000411, 000416, 000431, 000520); FAC ¶¶ 41-42.

**(1) The Wagner Retina Center Records**

The Wagner Retina Center records documented no evidence of macular edema or subretinal fluid, while assessing Rouse as a high-risk glaucoma suspect for whom a special ophthalmic solution was prescribed. (ROUSE 000432-40); FAC ¶ 45.

**(2) Kirven Orthopedic Group Records**

Dr. Kirven examined Rouse on April 19, 2022. (ROUSE 000402-10); FAC ¶ 43. Although Dr. Kirven referenced Rouse's concussion history, he also reported that Rouse's 2017 brain MRI "[s]hows no abnormalities of the brain" and acknowledged that Rouse's "neuropsychological testing … did not reveal any cognitive abnormality." (ROUSE 000408-09). And although Dr. Kirven agreed with the impairment ratings that Dr. Wardell had assigned in 2014 under the *American Medical Association's Guides to the Evaluation of Permanent Impairment* ("AMA Guides"), those ratings measured the degree of impairment to Rouse's lower extremities. (ROUSE 000409). They did not assess whether Rouse was totally and permanently disabled from engaging in any occupation or employment for remuneration or profit under the Plan. (*Id.*).

**(3) Hampton Roads Neuropsychology Records (Dr. Sautter)**

Dr. Scott Sautter's April 2022 neuropsychological evaluation of Rouse revealed "a significant improvement in general cognitive function, including language tasks of fluency and naming, visual perceptual reasoning, memory and cognitive tests of executive functioning." (ROUSE 000429). Dr. Sautter concluded that Rouse's neuropsychological test profile was "not consistent with a Major Neurocognitive Disorder, such as a degenerative dementia" and that Rouse

was "likely to have a psychological contribution to his somatic complaints." (*Id*.). His diagnostic impressions were "(1) Mild Cognitive Impairment secondary to Depression, Pain and Sleep Dysfunction; and (2) History of concussions and musculoskeletal injuries incurred playing football." (*Id*.); FAC ¶ 44.

In a subsequent October 28, 2022 record review, Dr. Sautter noted that the Neutral Physicians who conducted psychiatric and neuropsychological reviews had reached "similar opinions that Mr. Rouse did not have psychiatric or cognitive deficits to a level that prevented him from engaging in any occupation for remuneration or profit." (ROUSE 000415). Dr. Sautter also observed that Neutral Physician Dr. Heilbronner's neuropsychological test findings were not materially different from Dr. Sautter's April 2022 findings of mild cognitive impairment. (*Id*.). Dr. Sautter further observed that any accommodations Rouse required were described as restrictions in his "current work," rather than an inability to work altogether. (*Id.*).

**H. The Board's Final Determination**

On November 22, 2022, the Board unanimously determined that Rouse was ineligible for T&P benefits because eight Neutral Physicians had evaluated him and none had found him totally and permanently disabled, failing Section 3.1(d)'s threshold. (ROUSE 000519-21); FAC ¶ 47. The Board expressly acknowledged the potentially conflicting evidence in the file, including Dr. Kirven's opinion, and explained why it gave greater weight to the medical opinions of eight Neutral Physicians: their relevant specialties, experience evaluating Players and other professional athletes, thorough evaluations, unanimity, joint selection by the NFLPA and the Management Council, flat-fee compensation irrespective of outcome, and contractual obligations of impartiality, which the Board determined they satisfied in Rouse's case. (ROUSE 000520).

## STANDARD OF REVIEW

The Plan vests the Board with discretionary authority to decide claims and construe the Plan's terms, as Rouse's own pleading acknowledges. Plan §§ 9.2, 9.9 (ROUSE 000053-54, 000057); FAC ¶ 28. Where a plan confers such discretion, the court reviews the administrator's decision only for abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989); *Hayes v. Prudential Ins. Co. of Am.*, 60 F.4th 848, 851 (4th Cir. 2023).

Under the abuse-of-discretion standard, the Board's decision must be upheld if it is reasonable, even if the Court would have reached a different conclusion independently. *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010) ("[W]e may not substitute our own judgment in place of the judgment of the plan administrator"); *Geiger v. Zurich Am. Ins. Co.*, 72 F.4th 32, 37 (4th Cir. 2023); *Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 417 (4th Cir. 2004); *Grabowski v. Hartford Life & Accident Ins. Co.*, 747 F. App'x 923, 925 (4th Cir. 2018).

The Fourth Circuit evaluates the reasonableness of a benefit determination under the eight *Booth* factors:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

201 F.3d at 342-43; *accord Geiger*, 72 F.4th at 37-39 (applying the *Booth* factors and upholding a discretionary determination as reasonable).

These factors are applied under a "highly deferential" standard. *Geiger*, 72 F.4th at 38. The question is whether the Board's decision was the product of a "deliberate, principled reasoning process" and was "supported by substantial evidence." *Id.* Substantial evidence is evidence that

"a reasoning mind would accept as sufficient to support a particular conclusion"—"more than a scintilla but less than preponderance." *Hailey v. Verizon Commc'ns Long Term Disability Plan*, No. 1:13-CV-001528-GBL, 2014 WL 5421242, at *5 (E.D. Va. Oct. 22, 2014) (quoting *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984)); *Grabowski*, 747 F. App'x at 925. The Board's reasonable interpretation controls even if it is not the most reasonable one. *Collins v. Aetna Life Ins. Co. of Am.*, 700 F. App'x 205, 208 (4th Cir. 2017) (an administrator "only has to offer a reasonable, and not the most reasonable, interpretation of a plan term"); *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 263 (4th Cir. 2009); *Grabowski*, 747 F. App'x at 926.

## ARGUMENT

### I. The Board Did Not Abuse Its Discretion in Determining That Rouse Failed to Satisfy Section 3.1(d)'s Threshold Requirement.

Rouse seeks T&P benefits under ERISA § 502(a)(1)(B), FAC ¶¶ 53-54, and as the claimant he bears the burden of proving every condition of eligibility, including Section 3.1(d)'s threshold requirement. Each of the eight *Booth* factors, addressed in turn below, confirms that the Board's determination was reasonable and should be upheld.

#### A. The Board applied the Plan's terms as written.

The first *Booth* factor is the language of the plan. *Booth*, 201 F.3d at 342. ERISA's core principle is that participants may recover only benefits owed "under the terms of the plan," 29 U.S.C. § 1132(a)(1)(B), and the statutory scheme "is built around reliance on the face of written plan documents." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100-01 (2013). ERISA's "principal function" is to "protect contractually defined benefits" according to the terms of the plan. *Id.* at 100. Although the Board has full and absolute discretion to interpret the Plan, Plan § 9.2 (ROUSE 000053-54), "the administrator is not free to alter the terms of the [P]lan or to construe unambiguous terms other than as written." *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d

170, 176 (4th Cir. 2005), *abrogated on other grounds by Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 355 (4th Cir. 2008).

Section 3.1(d), quoted in full above, is unambiguous: it conditions T&P benefit eligibility on a qualifying medical finding by at least one Neutral Physician and provides that, without that finding, the Player is ineligible "regardless of any other fact(s), statement(s), or determination(s)" in the administrative record. Plan § 3.1(d) (ROUSE 000011); FAC ¶ 37.

The Board applied that Plan provision precisely as written. Eight Neutral Physicians examined Rouse across the four specialties covering his claimed impairments, and none found him totally and permanently disabled. (ROUSE 000519-20). Because no Neutral Physician rendered the qualifying finding required by Section 3.1(d), the Board's decision was consistent with the Plan's express eligibility requirements. *Colucci*, 431 F.3d at 176.

The court in *Smith v. NFL Player Disability & Neurocognitive Benefit Plan* upheld the Board's denial on precisely this record: there, as here, eight Neutral Physicians evaluated the Player on initial application and appeal, none found him totally and permanently disabled, and the court held that "there is no question that the Disability Board's denial of [the Player's] appeal based on his failure to meet the Neutral Rule is consistent with the terms of the Disability Plan." No. 1-22-CV-00928-RP, 2024 WL 722594, at *6 (W.D. Tex. Jan. 9, 2024), *report and recommendation adopted*, No. 1:22-CV-928-RP, 2024 WL 1123588 (W.D. Tex. Mar. 13, 2024); *accord Youboty v. NFL Player Disability & Neurocognitive Benefit Plan*, 856 F. App'x 497, 500 (5th Cir. 2021) (Board's refusal to consider surgery that occurred after the application deadline was consistent with the terms of the Plan and was not abuse of discretion).

Nor does the Board's reliance on Section 3.1(d) render its decision a rubber stamp of the Neutral Physician reports. The Board reviewed the record, weighed the conflicting evidence, and

explained its reasoning, as Section 9.9 required. Plan § 9.9 (ROUSE 000057); (ROUSE 000519-21). The Board's application of Section 3.1(d)'s eligibility requirement was consistent with the Plan's terms and the discretion afforded to it under the Plan. In reviewing the Board's decision, the Court "cannot rewrite the terms of the [Plan]" by allowing an exception to Section 3.1(d)'s eligibility requirement. *Smith*, 2024 WL 722594, at *8.

Accordingly, the first *Booth* factor is satisfied.

**B. The Board's decision served the Plan's purposes and goals.**

The second *Booth* factor asks whether the Board's decision served the Plan's purposes and goals. *Booth*, 201 F.3d at 342-43. The Plan is a product of collective bargaining: the NFLPA and the Management Council negotiated its eligibility standards, and in Section 3.1(d) they agreed that a qualifying medical finding by a jointly selected, impartial specialist is a precondition to T&P benefits. Plan §§ 3.1(d), 12.3(a) (ROUSE 000011, 000062). That structure serves the balance that every benefit plan must strike: "the need to ensure that individual claimants get the benefits to which they are entitled" and "the need to protect employees and their beneficiaries as a group from a contraction in the total pool of benefits available." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 326 (4th Cir. 2008). Enforcing Section 3.1(d) as written advances the Plan's goals because it honors the objective, bargained-for T&P eligibility standard the parties adopted. *See Smith*, 2024 WL 722594, at *6 (the bargaining parties adopted the Neutral Rule to "create an objective standard that would promote administrative efficiency and decision-making by giving primacy to the findings of" the Neutral Physicians). Paying only those benefits that the Plan's terms authorize is consistent with the Plan's purposes and goals. *Friz v. J&H Marsh & McLennan, Inc.*, 2 F. App'x 277, 281 (4th Cir. 2001). Awarding benefits to a Player whom no Neutral

Physician found disabled would disregard the objective eligibility standard the bargaining parties incorporated into the Plan. Accordingly, the second *Booth* factor supports the Board's decision.

**C. The Board relied on the concurring opinions of eight specialist Neutral Physicians and objective testing.**

The third *Booth* factor examines the adequacy of the materials considered and the degree to which they support the Board's decision. *Booth*, 201 F.3d at 342. As detailed in the Statement of Material Facts, *supra* Parts D and F, substantial evidence supported the Board's denial of Rouse's claim. Eight Neutral Physicians, spanning each specialty relevant to Rouse's claimed impairments, examined him, reviewed his records, and unanimously concluded that he was not totally and permanently disabled. Those opinions were corroborated by objective evidence, including: two comprehensive neuropsychological evaluations yielding results within normal limits; four MoCA administrations producing normal-range scores of 28 out of 30; largely normal neurological examinations and brain imaging; orthopedic findings documenting substantial retained strength and function; and psychiatric evaluations identifying no disabling psychiatric condition.

The record likewise provided reasonable explanations for Rouse's reported subjective symptoms that were consistent with the Neutral Physicians' conclusions. Rouse himself attributed his difficulty focusing and concentrating to pain rather than to an independent cognitive disorder. (ROUSE 000098, 000277, 000311). His own retained neuropsychologist, Dr. Sautter, diagnosed only a mild cognitive impairment secondary to depression, pain, and sleep dysfunction, a treatable condition resulting from other medical issues rather than an independent, permanent, and totally disabling neurocognitive disorder. (ROUSE 000429). A plan administrator need not accept subjective complaints at face value where objective evidence does not support them. *See Balkin v. Unum Life Ins. Co.*, No. GLS 21-1623, 2024 WL 1346789, at *22 (D. Md. Mar. 29, 2024) ("[I]f

objective medical evidence was not required, reviewing the validity of long term disability claims would be meaningless because plan administrators would be forced to accept as adequate all subjective claims of participants.") (internal citation and quotation marks omitted).

Rouse principally alleges that the denial was "against the manifest weight of the medical evidence" and contrary to the opinions of his own physicians, particularly Dr. Kirven. FAC ¶¶ 49, 51, 56. Neither argument establishes an abuse of discretion.

*First*, "manifest weight of the evidence" is not the governing standard. The question is whether the Board's decision was reasonable and supported by substantial evidence, which requires less than a preponderance. *Geiger*, 72 F.4th at 38; *Grabowski*, 747 F. App'x at 925. The existence of conflicting medical evidence does not render a benefits determination unreasonable. *Elliott*, 190 F.3d at 606 ("[I]t is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented.").

*Second*, there is no treating-physician rule under ERISA. A plan administrator is not required to "accord special deference to the opinions of treating physicians" and may credit the opinions of other examining specialists instead. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831, 834 (2003). The point applies with even greater force here because Drs. Kirven and Sautter were not treating physicians at all, but one-time examiners retained during the appeal process. (ROUSE 000403, 000417).

The Plan grants the Board "full and absolute discretion to determine the relative weight to give" the evidence in a Player's record. Plan § 9.9 (ROUSE 000057). The Board reasonably assigned little weight to Dr. Kirven's opinion. Most fundamentally, Dr. Kirven did not purport to apply the Plan's definition of total and permanent disability. (ROUSE 000410). Instead, he opined that, under unspecified "today's new standards," Rouse would be considered "totally impaired."

(*Id.*). The Board therefore was not required to treat Dr. Kirven's opinion as establishing eligibility under Section 3.1(d). Moreover, Dr. Kirven's conclusion was difficult to reconcile with his own examination findings, his acknowledgment that Rouse's neuropsychological testing revealed no cognitive abnormality, and his recognition that Rouse's 2017 brain MRI was normal. (ROUSE 000406-09). Also, Rouse's impairment ratings referenced in Dr. Kirven's report were extremity ratings under the AMA Guides, which measure anatomic impairment rather than the inability to engage in any occupation or employment. (ROUSE 000409). Nor did Dr. Sautter's report establish that Rouse was totally and permanently disabled. Dr. Sautter found no major neurocognitive disorder and attributed Rouse's mild cognitive impairment to depression, pain, and sleep dysfunction, identifying limitations only in Rouse's "current work." (ROUSE 000415, 000429). Likewise, the Wagner Retina Center records did not support a finding of total disability. Those records assessed Rouse as a glaucoma suspect, prescribed ophthalmic treatment, and identified no condition suggesting that he was unable to engage in any occupation. (ROUSE 000432-40).

Rouse also makes a passing reference to the Board's alleged failure to consider the cumulative effect of his impairments. FAC ¶ 57. But *Smith* rejected essentially the same argument, holding that the unanimous opinions of eight Neutral Physicians constituted substantial evidence supporting the Board's denial and that a reviewing court could not rewrite the Plan's eligibility requirements. 2024 WL 722594, at *7-8. Nor did Rouse's own physicians assess his impairments cumulatively; Dr. Kirven conducted only an orthopedic medical evaluation, Dr. Sautter conducted only a neuropsychological assessment, and Rouse did not submit a functional capacity evaluation. (ROUSE 000403, 000417).

Finally, the record contained substantial evidence of Rouse's retained functional capacity during the period for which he sought benefits. Throughout the administrative proceedings, Rouse continued serving as a Virginia Beach City Councilman. Dr. Azhar noted that, "per [Rouse's] own assessment," he "function[ed] at a high level" at work (ROUSE 000230); Dr. Sherman noted that he was "working successfully as a Councilman" (ROUSE 000240); and Dr. Heilbronner documented his ability to continue performing his Council and foundation duties. (ROUSE 000314). When asked whether he had difficulty carrying out his Council responsibilities, Rouse responded: "As long as my body is able to go, I'm good." (ROUSE 000297). The record likewise reflected broad independent daily functioning that contrasted with Rouse's assertion that he had been unable to sustain gainful employment for more than a decade. (ROUSE 000098-99, 000206-07, 000248, 000297-99). The Board was entitled to rely on the Neutral Physicians' consideration of these facts in concluding that Rouse was not totally and permanently disabled.

Accordingly, the third *Booth* factor strongly supports the reasonableness of the Board's decision.

### D. The remaining *Booth* factors confirm that the Board's decision was reasonable.

**Factor 4.** The Board's interpretation of Section 3.1(d) was consistent with the Plan's other provisions and with earlier interpretations. *Booth*, 201 F.3d at 342. The Board applied Section 3.1(d) according to its terms and consistently with the Committee's application of the same Plan provision at the initial level of review. (ROUSE 000266, 000520). Courts likewise have upheld the Board's enforcement of Section 3.1(d) as consistent with the Plan's terms. *See Smith*, 2024 WL 722594, at *6.

**Factor 5.** The Board's decision-making process was "reasoned and principled." *Booth*, 201 F.3d at 342-43. It involved two rounds of examinations by specialists in each field of Rouse's

claimed impairments, disclosure of the Neutral Physician reports with an opportunity to respond, consideration of Rouse's supplemental submissions, and a written decision identifying the Plan provisions relied on and explaining the basis for the Board's determination. (ROUSE 000484-85, 000519-21). That is the hallmark of a reasoned and principled process. *See Wilson v. UnitedHealthcare Ins. Co.*, 27 F.4th 228, 238-39 (4th Cir. 2022).

**Factor 6.** The Board's decision complied with ERISA's procedural and substantive requirements. *Booth*, 201 F.3d at 343. The process just described tracked each step that ERISA § 503 and its implementing regulation require, and Rouse's contrary argument that he was denied a full and fair review is addressed, and refuted, in Part II below.

**Factor 7.** The Board applied the Plan's own criteria. *Booth*, 201 F.3d at 342-43. The Board's written decision affirmatively disclaimed reliance on any other internal rule, guideline, protocol, or standard (ROUSE 000521), confirming that the denial rested on the Plan's terms rather than undisclosed criteria.

**Factor 8.** Finally, the Board's motives were proper, and the Board operated free from any structural conflict of interest. *Booth*, 201 F.3d at 342-43. A structural conflict exists where the same entity that determines eligibility also pays benefits out of its own pocket. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). That is not how this Plan is structured. The Board is composed equally of trustees appointed by the Management Council and trustees appointed by the NFLPA—the union that represents the Players themselves. Plan § 9.1 (ROUSE 000053). Benefits are paid not from the trustees' own funds but from the assets of the Plan's Trust, funded by club contributions under the parties' collective bargaining agreement and held for the exclusive benefit of eligible Players. Plan §§ 8.1, 8.2 (ROUSE 000052). Courts have consistently held that this jointly administered, Taft-Hartley structure presents no structural conflict. *See Boyd v. Bert*

*Bell/Pete Rozelle NFL Player Ret. Plan*, 796 F. Supp. 2d 682, 690-91 & n.2 (D. Md. 2011); *Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. JFM-10-3203, 2011 WL 10005532, at *2 (D. Md. Jan. 13, 2011); *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 487 F. Supp. 3d 807, 813 (N.D. Cal. 2020) ("[T]he Plan does not have a structural conflict that needed to be mitigated as the Board consists equally of [P]layer representatives and NFL representatives."), *aff'd and remanded on other grounds*, 855 F. App'x 332 (9th Cir. 2021); *Johnson v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 468 F.3d 1082, 1086 (8th Cir. 2006); *Courson v. Bert Bell NFL Player Ret. Plan*, 75 F. Supp. 2d 424, 431 (W.D. Pa. 1999), *aff'd*, 214 F.3d 136 (3d Cir. 2000); *Morris v. Nat'l Football League Ret. Bd.*, 833 F. Supp. 2d 1374, 1386 (S.D. Fla. 2011), *aff'd*, 482 F. App'x 440 (11th Cir. 2012).

In any event, a structural conflict is only one factor, and it proves "less important (perhaps to the vanishing point)" where the plan has taken steps to reduce potential bias and promote accuracy. *Glenn*, 554 U.S. at 117. The Plan has done exactly that through the jointly selected, flat-fee Neutral Physician structure, and the Board expressly found that the Neutral Physicians satisfied their obligations of impartiality in Rouse's case. Plan § 12.3(a) (ROUSE 000062); (ROUSE 000520).

Every *Booth* factor confirms that the Board's decision was reasonable, and it must therefore be upheld under the deferential abuse-of-discretion standard.

## II. The Board Provided Rouse a Full and Fair Review.

Rouse separately contends that the Board failed to provide a full and fair review under ERISA § 503 and 29 C.F.R. § 2560.503-1 because it did not adequately explain its basis for disagreeing with his retained physicians. FAC ¶ 58.

The premise fails. ERISA does not require that a decision letter recite every aspect of a claimant's record; a determination complies if, read in its entirety, it provides the claimant with the information necessary to understand the decision and perfect his claim. *See Switzer v. Benefits Admin. Comm.*, 2014 WL 4052855, at *12 (D. Md. Aug. 13, 2014). For disability claims, the governing regulation requires that an adverse determination on review include "a discussion of the decision, including an explanation of the basis for disagreeing with or not following" the views of health care professionals who treated the claimant. 29 C.F.R. § 2560.503-1(j)(6)(i). The Board's final decision satisfied that requirement. It quoted Section 3.1(d) and explained that, without a qualifying finding by at least one Neutral Physician, a Player is ineligible for T&P benefits. (ROUSE 000520). It expressly acknowledged the "potentially conflicting evidence" in the record, including Dr. Kirven's opinion that Rouse was "totally impaired," and explained that it was giving greater weight to the unanimous opinions of the eight Neutral Physicians because they were specialists in the relevant fields, had performed thorough evaluations of Rouse, and were selected and compensated through the Plan's neutral process. (*Id.*).

That explanation was sufficient to inform Rouse why the Board declined to follow the contrary opinions submitted on his behalf. ERISA requires an explanation, not a point-by-point rebuttal of every contrary medical opinion or item of evidence in the administrative record. *See Switzer*, 2014 WL 4052855, at *12. The Board provided that explanation here.

Moreover, the administrative record confirms that Rouse received the full and fair review ERISA requires. The Board considered the entire record, including the materials submitted on appeal, as Sections 9.9 and 13.14(a) of the Plan require and as ERISA's claims-procedure regulation demands. Plan §§ 9.9, 13.14(a) (ROUSE 000057, 000065-68); 29 C.F.R. § 2560.503-

1(h)(2)(iv). Rouse, represented by counsel throughout the appeal, received all of the notice, review, and explanation required by ERISA and its implementing regulations.

**III. Any Relief Should Be Limited to Remand.**

Should the Court conclude that the Board abused its discretion (which is denied), the appropriate remedy would be remand rather than an award of benefits. Where a court identifies a deficiency in a discretionary benefit determination, the ordinary course is to return the claim to the administrator. *See Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1007-08 (4th Cir. 1985) (benefit eligibility must be resolved by the plan in the first instance). That approach accords with ERISA's allocation of responsibility, under which the Board interprets and applies the Plan in the first instance, subject only to deferential judicial review. *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) ("[G]rant[ing] primary interpretive authority over an ERISA plan to the plan administrator preserves the 'careful balancing' on which ERISA is based").

An award of benefits would be especially inappropriate here because Section 3.1(d) makes a qualifying Neutral Physician finding a prerequisite to eligibility. Plan § 3.1(d) (ROUSE 000011). A court confined to the administrative record cannot itself supply the finding that Section 3.1(d) requires. Therefore, the most Rouse could obtain, even on his own theory of the case, is a remand. *See* FAC, Prayer for Relief ¶ E (pleading remand as alternative relief).

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant its motion and enter judgment in Defendant's favor, dismissing the First Amended Complaint in its entirety and with prejudice.

Dated: August 31, 2026

Respectfully submitted,

/s/ Kristan B. Burch
Kristan B. Burch (VSB No. 42640)
Kaufman & Canoles, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
(757) 624-3343
kristan.burch@kaufcan.com

/s/ Edward J. Meehan
Edward J. Meehan, *pro hac vice*
Jovana Vujovic, *pro hac vice*
Groom Law Group, Chartered
1701 Pennsylvania Avenue NW
Washington, DC 20006
(202) 857-0620
emeehan@groom.com
jvujovic@groom.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2026, a true and correct copy of the foregoing document was filed through the CM/ECF system and sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

/s/Kristan B. Burch
Kristan B. Burch (VSB No. 42640)
Kaufman & Canoles, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
(757) 624-3343
kristan.burch@kaufcan.com